IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 11, 2025

## STATE OF TENNESSEE v. BRANDON TYLOR MULAC

**Appeal from the Criminal Court for DeKalb County**
**No. 2021-CR-58     Wesley Thomas Bray, Judge**

_____

### No. M2024-00401-CCA-R3-CD

_____

After the Defendant, Brandon Tylor Mulac, was arrested in Smith County with 396 grams of methamphetamine in his vehicle, law enforcement executed a search warrant on his home in DeKalb County and found another 425 grams of methamphetamine. The Defendant subsequently filed a motion to suppress the evidence from the DeKalb County search and a motion to exclude evidence from his Smith County arrest based on Rule 404(b) of the Tennessee Rules of Evidence, both of which were denied by the trial court. Following a jury trial, the Defendant was convicted of possession with intent to sell or deliver over three hundred grams of methamphetamine and received a sentence of sixty years' imprisonment. In this appeal, the Defendant argues the trial court erred based on the following three grounds: (1) in denying his motions to suppress because the search warrant and affidavit did not establish probable cause and because the affidavit contained false information in violation of <u>Franks v. Delaware</u>, 438 U.S. 154 (1978); (2) in admitting evidence from the Smith County traffic stop in violation of Rule 404(b); and (3) in denying his motion for judgment of acquittal because the evidence was insufficient to support the Defendant's conviction.[1] Upon review, we affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

CAMILLE R. MCMULLEN, P.J., delivered the opinion of the court, in which JOHN W. CAMPBELL, SR., and KYLE A. HIXSON, JJ., joined.

J. Brad Hannah, Smithville, Tennessee, for the appellant, Brandon Tylor Mulac.

Jonathan Skrmetti, Attorney General and Reporter; Johnny Cerisano, Assistant Attorney General; Bryant C. Dunaway, District Attorney General; and Greg Strong and Russell Tribble, Assistant District Attorneys General, for the appellee, State of Tennessee.

---

[1] We have reordered the Defendant's issues for clarity.

# OPINION

The facts giving rise to the Defendant's conviction stem from his arrest after a traffic stop in Smith County on April 6, 2021, and the subsequent search of his residence in DeKalb County shortly after midnight on April 7th. During the traffic stop, Sergeant Junior Fields of the Smith County Sheriff's Office ("SCSO") found six grams of crystal methamphetamine in the Defendant's right front pants pocket and 396 grams of methamphetamine, digital scales, and fentanyl in the Defendant's vehicle. Sergeant Fields also learned that the Defendant lived in DeKalb County. Sergeant Fields arrested the Defendant and his passenger Starlett Arnold.[2] On the same day, in a signed statement, Arnold alleged that the Defendant was a methamphetamine dealer and that she recently saw him hide a large Ziplock bag behind a picture in his kitchen. Arnold's handwritten statement provided, in relevant part, as follows:

> I have told officers JR Fields, Dusty Hailey, [and] Steve Babcock that Jimmy McKeown at 182 EH Hass Road in Smithville, TN and I reside at this address for 2 months now [and] there is a safe in the master bedroom to the left of the closet. Inside this safe is 6 gallon size freezer bags [f]ull of ice (methamphetamine) and 8 ball of heroin [sic], a couple guns (pistols) and several thousands of dollars in cash. In [and] around his home is stolen tools that people have traded to him for drugs. [Jimmy] buys his meth from [the Defendant]. I was with today when we were caught. Around 2:-2:15 today I left 182 EH Hass Road and went to [the Defendant's residence] to pick him up to go sell an 8 ball. [The Defendant] had just then returned from Atlanta. [The Defendant and] K.K. (?) (in original) went to Atlanta yesterday around 5-6 and before he left he brought Jimmy the [methamphetamine] that is inside his safe. Jimmy has video cameras w/ a DVR in his room recording both inside and outside the residence. Before we ([the Defendant] and I) left [the Defendant]'s home, [the Defendant] hid a bag (gallon freezer [Z]iplock bag) behind a picture in the kitchen that just sits on the top of the wooden ([b]rown wooden) cabinet [and] drawer (looks like a dresser) in the right hand corner of the kitchen. It is a fairly large picture. There are syringes in the back bedroom that have been used by a friend of [the Defendant's], Brett. Brett is one of his sellers [and] is living w/ Tommy Wade. I told the officers who would be there. . . . I seen the gallon bag [the Defendant] hid behind the picture today when he hid it before we left at 3:15 [p.m.].

---

[2] At trial, Sergeant Fields also referred to the passenger as "Desiree Arnold Delk" or "Delk Arnold." We will refer to her as Starlett Arnold, as listed in her statement.

Based on this information, Sergeant Fields contacted the DeKalb County Sheriff's Department ("DCSD"), and Detective Andrew Lawrence submitted an affidavit to the DeKalb County Criminal Court to obtain a search warrant for the Defendant's home. Detective Lawrence's affidavit provided, in pertinent part, as follows:

1. On 4-6-2021, Sgt. Junior Fields . . . conducted a traffic stop on a maroon Hyundai Santa Fe. The occupants of the vehicle were [the Defendant and Arnold]. Inside the vehicle in a black purse was estimated 1 pound of methamphetamine [and other narcotics.] Both occupants of the vehicle were arrested. Starlett Arnold spoke with Sgt. Junior Fields and told him about two locations in DeKalb County that had large quantities of methamphetamine and heroin. Starlett Arnold was transported to [SCSO, where] she signed a waiver of her rights and wrote a statement about the information she had firsthand knowledge of. The following is my summary of her statements. She stated that she lived at 182 E.H. Hass Rd[.] Dowelltown, TN 37059 with Jimmy McKewon SSN []. There is a safe in the master bedroom that contains large amounts of narcotics. She said there is 6 gallon sized Ziploc bags full of methamphetamine, 3.5 grams of heroin, several pistols, and several thousand dollars in cash. She said there are stolen tools around the house and in the outbuildings around the house. She said she saw the narcotics around 2-2:15. . . . [The Defendant] sells methamphetamine to . . . McKeown. She said that [the Defendant] and K.K. went to Atlanta yesterday afternoon around 5-6pm and then brought the 6 bags of methamphetamine over to McKeown's. [The Defendant] resides at 402 S. Mountain St. Smithville, TN 37166. Arnold said she was with [the Defendant] before they left and went to Smith County [sic] he placed a gallon sized bag of methamphetamine behind a picture that sits on top of the wooden cabinets. It is a fairly large picture. She said they left at 3:15 and that's when [the Defendant] placed the methamphetamine behind the picture. Consent to search . . . Arnold's phone was given and Sgt. Fields saw text messages that confirm that [the Defendant] had made a trip to Atlanta yesterday 4-5-2021.

2. In the weeks prior, Detective Merriman had a different confidential source who told me about the safe in the bedroom as well as large quantities of methamphetamine, cash, guns, and other narcotics. The source also stated there was stolen property inside and around the house as well as outbuildings and trailers around the property. He received pictures of the safe, large amounts of narcotics, and various tools the source said were stolen. The source has been associated with methamphetamine users and is aware of how methamphetamine looks and packaged [sic].

- 3 -

On April 6, 2021, the DeKalb County Criminal Court determined the affidavit established probable cause and issued a search warrant at 10:29 p.m. for the Defendant's residence at 402 South Mountain Street in Smithville, Tennessee. DCSD executed the search warrant shortly after midnight on April 7th while the Defendant was in custody and found 0.26 grams of fentanyl and 424.58 grams of methamphetamine.

On November 15, 2021, the DeKalb County Grand Jury indicted the Defendant for possession of over three hundred grams of methamphetamine with intent to sell or deliver, a Class A felony, in violation of Tennessee Code Annotated Section 39-17-434,-417(j)(10) in count one, and possession of fentanyl with intent to sell or deliver, a Class C felony, in violation of Section 39-17-417 in count two.

On November 23, 2022, the Defendant filed a motion to suppress and argued that the search warrant and affidavit discussed above did not establish probable cause to search his residence. The Defendant also argued that Arnold was an unreliable informant "of the criminal milieu," and that the affidavit only described drugs located at her home in Dowelltown. The Defendant asserted that, although the affidavit stated his address and that he hid methamphetamine behind a picture, it did not state that the picture was located at his address. The Defendant also argued the affidavit contained no nexus between his residence, the items to be sized, and criminal activity. In an amended motion to suppress, filed on March 14, 2023, the Defendant argued the affidavit violated Franks because it implied Arnold included the Defendant's address in her written statement when she did not. 438 U.S. at 154. The Defendant also argued that Arnold's text messages did not corroborate the assertion that he traveled to Atlanta the day before his Smith County arrest.

At the pre-trial hearing concerning the Defendant's motion to suppress and his amended motion, DCSD Detective Mason Merriman testified that Sgt. Fields informed him about the Smith County traffic stop on April 7, 2021. Sergeant Fields told Detective Merriman that he recovered approximately one pound of methamphetamine from the Defendant's vehicle. Detective Merriman testified that Sgt. Fields took Arnold's statement in which she alleged that she and the Defendant "left [the Defendant's] residence in [DeKalb County] enroute to Smith County to deliver the drugs." Sergeant Fields told Detective Merriman that Arnold gave him the Defendant's address. Sergeant Fields also informed Detective Merriman there was a bag of methamphetamine hidden behind a picture in the Defendant's kitchen.

Detective Merriman testified that he corroborated the information in Arnold's statement "to the best of [his] ability." Detective Merriman testified that Sgt. Fields showed him text messages from Arnold and the Defendant's cellphones confirming the Defendant's trip to Atlanta. There was also location data that showed that the Defendant was "south of [DeKalb County]" at a time that coincided with the Defendant's trip.

Detective Merriman testified that he was satisfied that the information Arnold provided was accurate. Detective Merriman also testified that he and Detective Lawrence drafted the affidavit supporting the warrant. Detective Merriman testified that the affidavit described the residences of the Defendant and McKeown, and that he did not feel the affidavit misrepresented any facts.

Detective Merriman testified that Detective Lawerence, Sheriff Patrick Ray, Chief Deputy Robert Patrick, and Detective Steven Barrett helped with the warrant, along with the Tennessee Bureau of Investigation ("TBI") and SCSO. Detective Merriman also testified that Detective Barrett found over three hundred grams of methamphetamine in the Defendant's freezer after helping to execute the warrant. Detective Merriman testified that it was common for people in "the narcotics world" to shuffle contraband between different hiding places if something raised their suspicions, such as when "someone [is not] able to answer their phone." Detective Merriman testified that the execution of the search warrant showed that the affidavit was accurate.

On cross-examination, Detective Merriman testified that writing the affidavit was a collaborative effort but that he "did the lion's share of the work," including drafting the statement in support of probable cause. Detective Merriman admitted that the affidavit and warrant contained some errors; for example, the search warrant listed the Defendant's address as 420 South Mountain Street, but the affidavit listed it as 402 South Mountain Street. Detective Merriman also admitted that he did not speak with Arnold and could not recall reading her statement. Detective Merriman testified that he considered Sgt. Fields a reliable source but conceded that he did not know if Arnold was a reliable informant when he drafted the affidavit. Detective Merriman also testified that Arnold's statement did not contain the Defendant's address, but he knew where the Defendant lived from previous cases. Detective Merriman conceded that he should not have included the address in his summary of Arnold's written statement. Detective Merriman testified that the address was the only information he independently verified.

Detective Merriman testified that Sgt. Fields showed him text messages confirming that the Defendant was traveling at the time he allegedly drove to Atlanta. In the messages, the Defendant stated he was at a rest stop, which indicated to Detective Merriman that the Defendant was traveling. Detective Merriman testified that the Defendant never stated he was in Atlanta or that he was traveling to acquire narcotics. Detective Merriman also testified that he should have included the text messages in the affidavit. Detective Merriman testified that he could have more clearly indicated that the picture the Defendant had hidden the methamphetamine behind was in his kitchen in the affidavit, even though the sentence describing the picture comes after the sentence with the Defendant's address. Detective Merriman testified that, although law enforcement found a bag of methamphetamine in the Defendant's kitchen, the bag was not hidden behind a picture.

On redirect examination, Detective Merriman identified the Defendant in the courtroom. Detective Merriman testified that it is common in "the drug world" for the location of contraband to change quickly. Detective Merriman speculated that it was possible someone learned about the Defendant's arrest in Smith County and moved the methamphetamine to a different location in the kitchen. Detective Merriman also testified that he did not intentionally put misleading information in the affidavit.

In denying the motion to suppress, the trial court found that the affidavit stated the Defendant's address, followed by a statement that Arnold was with the Defendant before they left for Smith County and saw him hide a bag behind a picture in the kitchen. Based on the four corners of the affidavit, the trial court found that the "plain, common sense" reading of the affidavit was that Arnold informed Sgt. Fields that the Defendant hid a bag of methamphetamine behind a picture in his kitchen. Based on the totality of the circumstances, the trial court found that the search warrant was valid, and its issuance was based on a proper finding of probable cause. The trial court also found no Franks violations in the warrant. The trial court issued its written order denying the Defendant's motion on May 22, 2023.

The Defendant filed a second motion to suppress and argued the affidavit was misleading because it stated that the bag hidden behind the picture contained methamphetamine, even though Arnold did not specify what was in the bag in her written statement. The hearing concerning the Defendant's second motion to suppress was conducted outside the presence of the jury at trial. The Defendant entered Arnold's written statement, the warrant, and affidavit into evidence and called Sgt. Fields to testify as a witness. Sergeant Fields testified that he initiated a traffic stop of the Defendant's vehicle in April 2021, based on an arrangement Arnold made with Sgt. Fields to deliver methamphetamine to the Bush Creek Post Office in Smith County. Sergeant Fields had no prior communication with the Defendant. He arrested Arnold and the Defendant, interviewed Arnold, and took her written statement. Although Arnold told Sgt. Fields that the bag that the Defendant had hidden behind the picture contained methamphetamine during the interview, she did not include this information in her written statement. Sergeant Fields testified that he did not instruct Arnold to specify the contents of the bag in her written statement. On cross-examination, Sgt. Fields testified that his entire conversation with Arnold was about methamphetamine. The trial court determined that the warrant was valid and that the Defendant had not presented any new evidence that would justify modifying its prior ruling.

On March 8, 2023, the Defendant filed a motion in limine to exclude evidence from the Smith County traffic stop, arguing that it was extremely prejudicial propensity evidence. Although the Defendant did not cite any legal authority, the trial court construed

the motion as a motion to exclude the evidence based on Rule 404(b) of the Tennessee Rules of Evidence. In a jury out hearing during trial, the State argued that the evidence from the traffic stop established the Defendant's intent to sell or deliver methamphetamine. The State also argued that the evidence was necessary to fill chronological gaps in its case. The trial court conducted a hearing, and Sgt. Fields testified that there were two passengers in the vehicle the Defendant was driving, Arnold and the Defendant's minor daughter. Sergeant Fields also testified that he found six grams of methamphetamine on the Defendant's person, and 396 grams of methamphetamine, one ounce of fentanyl, and a set of digital scales in the vehicle. Sergeant Fields testified that he learned the Defendant had methamphetamine in DeKalb County when he interviewed Arnold. He provided this information to Detective Merriman, and he helped execute the search warrant on the Defendant's residence.

On cross-examination, Sgt. Fields characterized the traffic stop as a "buy bust" and testified that no drug transactions were involved. The drugs in the Defendant's vehicle were inside a black zippered bag, but Sgt. Fields could not remember where the bag was located in the vehicle. Sergeant Fields explained that, when creating case reports in the SCSO system, "you have to put both the people that [were] charged," and "you have to list them with something." When Sgt. Fields drafted his report on the traffic stop, he listed the 396 grams of methamphetamine as belonging to Arnold and the rest of the items as belonging to the Defendant. Sgt. Fields also testified that the Defendant's Smith County case had not yet been adjudicated at the time of trial.

The State argued that the evidence from the traffic stop was admissible to show the Defendant's intent to sell or deliver the methamphetamine found at 402 South Mountain Street, citing State v. White, No. M2011-01357-CCA-R3-CD, 2012 WL 4470652 (Tenn. Crim. App. Sept. 27, 2012). The State explained that the defendant in White participated in a drug transaction in one county and was arrested after traveling to a second county with more drugs. See id. at *1. The State also explained that this court affirmed the trial court's finding that the drug transaction in the first county was admissible to show the defendant's intent to sell or deliver the drugs in his possession in the second county. See id. at *8-*9.

The State also argued that the traffic stop evidence was necessary to "complete the story," citing State v. Gilliland, 22 S.W.3d 266 (Tenn. 2000). The State argued that Gilliland stands for the proposition that evidence of a prior crime or wrong may be admitted if its exclusion would confuse the jury by leaving a chronological or conceptual void in the State's case. Id. at 272-73. The State argued that the instant case began with the Smith County traffic stop, which provided the basis for the search warrant. The State asserted that, without the traffic stop evidence, it would be easy for the Defendant to argue this was a case of government overreach.

- 7 -

The Defendant argued that the traffic stop evidence was extremely prejudicial because it involved the same offense as the instant case. The Defendant argued the instant case was distinguishable from White because the prior bad act evidence in White involved a previous drug sale, but the prior bad act evidence in the instant case did not. See White, 2012 WL 4470652, at *1. The Defendant also argued that excluding the evidence would not create a void in the State's case because there was a search warrant, and the Defendant was not arrested until seven months after the warrant was executed. Therefore, according to the Defendant, the traffic stop evidence lacked probative value.

The trial court determined that the traffic stop evidence was admissible. The trial court explained that it had held a hearing in compliance with Rule 404(b) and found that "a material issue . . . exist[ed] other than a character trait." The trial court also found the proof "clear and convincing," and that its "probative value [was] not outweighed by the danger of unfair prejudice." The trial court found that the evidence was admissible either to show "intent through White or completeness through Gilliland" and denied the Defendant's motion in limine.

At trial, Sgt. Fields' direct examination testimony was consistent with his testimony from the previous motion hearings. He identified the Defendant in the courtroom as the driver involved in the traffic stop and testified that he found $2,100 in cash on the Defendant's person in addition to methamphetamine. Sgt. Fields also testified that neither the Defendant nor Arnold claimed ownership of the drugs found in the vehicle. Sergeant Fields testified that he contacted the Defendant's mother, Kitty Phillips, so she could pick up the Defendant's minor daughter from the scene of the traffic stop. Sergeant Fields examined the Defendant's driver's license, which listed 402 South Mountain Street as the Defendant's address. He arrested the Defendant for possession of methamphetamine with intent to sell or deliver, among other charges.

On cross-examination, Sgt. Fields testified that the narcotics he found were in the front of the vehicle, but he could not remember if they were on the driver's or passenger's side. He acknowledged that the vehicle belonged to Arnold even though the Defendant was driving. Sergeant Fields agreed that the Defendant was still in custody in Smith County when DCSD executed the search warrant in DeKalb County. He did not know how many people lived at the Defendant's residence. Sergeant Fields knew that Lexie Bullard and Jerry Green were both facing charges in Smith County and that Green was the Defendant's half-brother. On redirect examination, Sgt. Fields testified that he provided the information he gained from the traffic stop to Detective Merriman.

Detective Lawrence testified that he and Detective Merriman drafted two search warrants based on the information from Sgt. Fields, one for the Defendant's residence and one for McKeown's residence. Detective Lawrence testified that he "took over" the search

of the Defendant's residence because "one person can't be at two places at once[.]" Detective Lawrence had prior personal knowledge of the Defendant's address. Detective Lawrence, Sheriff Ray, Detectives Babcock, Hailey, and Barrett, Special Agent Billy Miller, and Deputies Steven Lawrence and Justin Bass participated in the search of the Defendant's residence after the warrant was issued. Detective Lawrence also testified that the Defendant's minor daughter, Phillips, and Logan Sullivan, the Defendant's girlfriend and mother of his minor daughter, were present during the search, but the Defendant was not because he was in custody at the Smith County Jail. To Detective Lawrence's knowledge, the search ended at around 3:00 a.m. Law enforcement arrested Sullivan after the search.

Detective Lawrence testified that law enforcement found drug paraphernalia, a small bag of white powder, and a large dry lock freezer bag containing 436.58 grams of a crystalline substance. The small bag was in a bedroom in an Altoids tin, and the large bag was in the freezer behind a bag of okra. Detective Lawrence testified that he placed the large bag into an evidence bag that he signed. Detective Lawrence also testified that he listed Sullivan as the defendant on the evidence bag because the Defendant was not present during the search. DCSD sent both bags to TBI for analysis, and the contents of the small bag was confirmed to contain fentanyl and content of the large bag was confirmed to contain methamphetamine.

Detective Lawrence explained the procedural differences between obtaining an arrest warrant and an indictment. With arrest warrants, an officer fills out a form, a judicial commissioner signs it, and the suspect is arrested on-site. With indictments, law enforcement "put[s] a packet together" and submits it to a grand jury. Detective Lawrence testified that DCSD often "hold[s] back . . . case[s]" to wait for a grand jury to convene because they do not convene often in DeKalb County. Detective Lawrence also testified that he did not seek an arrest warrant for the Defendant after the search because he was already in jail in Smith County.

On cross-examination, Detective Lawrence testified that there were "two or three" cars outside the Defendant's residence when he arrived to execute the search warrant. Detective Lawrence said that it is DCSD protocol to send multiple officers to execute a search warrant. Detective Lawrence confirmed that Sullivan and Phillips were present, but the Defendant was not. Detective Lawrence admitted he did not know if Green or Bullard lived at the residence, but he knew Green had been there before. Detective Lawrence also testified that the residence had power during the search, and he could not remember if Sullivan was wearing a headlamp when she was arrested. Detective Lawrence admitted it was possible that either Sullivan or Phillips put the methamphetamine in the freezer. Detective Lawrence also testified that the Defendant's name was not on the request form when DCSD sent the evidence to TBI for analysis.

Detective Lawrence testified that law enforcement found drug paraphernalia throughout the residence. Detective Lawrence also testified that he did not know how long it took to find the methamphetamine in the freezer because he was in another room at the time. Detective Lawrence testified that law enforcement did not seize Sullivan or Phillips's phones, nor did they arrest or interrogate Phillips because she was attending to the Defendant's minor daughter. Detective Lawrence admitted that law enforcement did not collect fingerprints during the search and confirmed that it was DCSD's policy to turn off body cameras during searches. Detective Lawrence testified that law enforcement arrested Sullivan on charges of methamphetamine and fentanyl possession because she was in close proximity to the drugs. Detective Lawrence also testified that the DeKalb County Grand Jury did not charge the Defendant until seven months after the search.

Defense counsel asked Detective Lawrence if he found a purple box with Sullivan's name on it during the search, and Detective Lawrence responded that he remembered seeing a heart-shaped box. The Defendant entered photographs of the purple box and a heart-shaped ashtray into evidence as a collective exhibit. One of the photographs depicted a purple wooden box that had Sullivan's name and the date "Dec. 8 2020" written on the inside of the lid. Inside the box were several partially smoked marijuana cigarettes, three of which were inside a small plastic bag. Next to the box was a plastic bag of marijuana, a blue bag that appeared to Detective Lawrence to contain a "methamphetamine rock," a package of cigarette rolling papers, and an open Altoids tin with a small bag inside containing what appeared to Detective Lawrence to be powdered methamphetamine or fentanyl. The Defendant also entered photographs of Sullivan's W2 tax form, which was on a counter next to drug paraphernalia, with the kitchen freezer in the background.

Detective Merriman's direct examination testimony was also consistent with his testimony from the pre-trial motion hearing. Detective Merriman testified that the weight or quantity of drugs in a person's possession was a key factor in determining whether the person intended to sell or distribute the drugs. Detective Merriman explained that "[p]eople [don't use] a pound of methamphetamine" recreationally, they break it down "into smaller sections" for sale. Detective Merriman testified that recreational methamphetamine users typically have 3.5 grams, also called an "eight ball," or less in their possession. Detective Merriman said that larger quantities of methamphetamine, like those found in the Defendant's freezer, are usually broken down into "eight ball" sized portions or smaller for resale. Detective Merriman helped write the search warrant, but he did not participate in its execution. Detective Merriman also testified that Sullivan died of a drug overdose sometime after the search.

On cross-examination, Detective Merriman testified that he did not know who put the drugs in the freezer or who touched them last. Detective Merriman also testified that he was aware that Green and Bullard frequented the Defendant's residence, but he did not

know if they lived there. Detective Merriman had received information from several law enforcement agencies that multiple known gang members frequented the Defendant's residence.

Detective Barrett testified that he became involved in the Defendant's case when Detective Merriman asked him for help with the search warrant. Detective Barrett also testified that he was part of the "perimeter team" stationed "on the back side of the [Defendant's] house in case anybody tried to flee" when the search began. Detective Barrett entered the house through the back door after other officers made their initial entry. Detective Barrett testified that DCSD received "information that there was a large quantity of methamphetamine in the kitchen area," and that he and Special Agent Miller searched the kitchen while "other law enforcement officials [were] assigned to other rooms." Detective Barrett also testified that he and Special Agent Miller found "a plastic bag of methamphetamine" under a bag of okra in the freezer. Detective Barrett testified that he and Special Agent Miller used a narcotics detection kit to test the bag's contents for the presence of methamphetamine and the results were positive. Detective Barrett gave the bag to Detective Lawrence to be sealed in an evidence bag. The State entered a series of photographs into evidence depicting the freezer, the bag of okra, and the bag of methamphetamine.

On cross-examination, Detective Barrett agreed that there were multiple officers on the perimeter team and that the search began around midnight. Detective Barrett did not know how many people would be at the residence, and he could not recall if any of the officers involved in the search discussed the issue. Detective Barrett saw a woman standing by a fire in the backyard as he approached the house. When Detective Barrett yelled "Sheriff's Department," the woman ran into the house and shut the door, but eventually, she came back outside. Detective Barrett detained the woman and determined that she was Sullivan. Detective Barrett testified that Sullivan was wearing a headlamp, but he could not remember if the house had power. Detective Barrett did not recall asking Sullivan about Green. Detective Barrett testified that he and Detective Merriman once pursued Green to the Defendant's residence prior to this case. Detective Barrett also testified that the Defendant was not at the residence during the search because he was in custody in Smith County, but Sullivan, another adult, and a minor child were present.

Although his body camera was off, Detective Barrett acknowledged that DCSD officers often "keep them on during the execution of [a] search warrant in case [they] encounter anything violent." Detective Barrett also testified that, after first executing a warrant, DCSD officers often remove their vests, with the body camera attached, so they "can search better." Detective Barrett did not know if there was any video of him finding the drugs in the freezer because he did not know if any nearby officers had their body cameras on. Detective Barrett said that the methamphetamine in the freezer was not in

plain view because the freezer was closed, and he had to move a bag of food to find it. Detective Barrett testified that anyone in the residence could access the freezer because it was not locked, and that it was possible that Phillips or Sullivan put the drugs there. Detective Barrett did not know if law enforcement interrogated Phillips or seized Sullivan's phone.

Chief Deputy Brian Williams testified that he did not participate in the search, and that he was DCSD's custodian of evidence at the time. Chief Williams said that the officers involved in the search put the evidence they found in an evidence locker. Chief Williams retrieved the evidence from the locker and personally transported it to TBI's Nashville laboratory. When TBI completed its analysis, Chief Williams transported it back to the evidence room at DCSD per DCSD's regular procedures. Chief Williams testified that Detective Lawrence filled out the TBI Crime Lab Form for the evidence. Chief Williams signed the form when he submitted the evidence to TBI. The State entered the form into evidence.

On cross-examination, Chief Williams testified that the evidence was in the evidence locker for "two or three days" before he collected it. Chief Williams said that only the custodian of evidence had the key to the evidence locker. Chief Williams confirmed that Sullivan was listed as the subject of the investigation on the evidence bag and the TBI Crime Lab Form. Chief Williams may have stopped for fast food while transporting the evidence to Nashville, but he did not otherwise make any stops. Chief Williams kept the evidence securely locked in the back seat of his pickup truck during transport.

TBI Forensic Chemistry Analyst Lela Jackson testified as an expert in forensic science. Her duties involved analyzing evidence for the presence of controlled substances. She explained that TBI places the evidence it receives into a secure vault "once all the information is entered into [the] Laboratory Information Management System." The evidence is then assigned a case number, and TBI sends the case information to the forensic sciences department, who then transfers the evidence into its own vault until testing is complete. Once testing is finished, the evidence is placed back in the secure vault to be picked up by the law enforcement agency that submitted it. Jackson tested the evidence in this case and followed TBI's standard testing procedures.

The State entered the Official Forensic Chemistry Report ("OFCR") that Jackson prepared for this case into evidence. The OFCR indicated that DCSD submitted a crystalline substance, a chunky white powder, orange tablet fragments, plant material, and a second crystalline substance to TBI. Jackson performed an attenuated total reflectance test ("FTIR"), a gas spectrometry exam ("GC/MS"), and a gas infrared spectroscopy test ("GC/IR") on the chunky white powder, which showed that it contained 0.26 grams of

methamphetamine and fentanyl. Jackson also performed FTIR and GC/IR tests on the second crystalline substance, which showed that it contained 424.58 grams of methamphetamine.

On cross-examination, Jackson testified that both the OFCR and the TBI Crime Lab Form indicated that Sullivan was the subject of the investigation and did not mention the Defendant. Jackson also testified that the tests she performed on the chunky white powder did not specify the ratio of fentanyl to methamphetamine in the sample. Jackson confirmed that she tested two samples from each substance she tested, not every single gram. Jackson also testified that DCSD did not submit fingerprint any requests. The State presented no further proof.

After the State presented its case in chief, the Defendant moved for a judgment of acquittal. The Defendant argued that the State failed to connect him to the methamphetamine in the freezer. The Defendant asserted that the State failed to prove that he had knowledge of the drugs or that he had the intent to exercise dominion and control over them. The Defendant also argued that he had no way to exercise control over the drugs because he was in custody in Smith County when they were found.

The State argued that the Defendant intended to return home and exercise dominion and control over the drugs, but Sgt. Fields arrested him before he could; therefore, the Defendant was in constructive possession of the drugs. The State also argued that the jury could infer intent from the fact that the Defendant had 396 grams of methamphetamine in his possession in Smith County and the fact that Phillips brought the Defendant's minor daughter to 402 South Mountain Street after the traffic stop. The State asserted that it was unlikely that Sullivan possessed the methamphetamine in the freezer because her death from a drug overdose indicated that she was a methamphetamine user, not a dealer, and Detective Merriman testified that people rarely possess a pound of methamphetamine for personal use. The State argued that if Sullivan did not possess the drugs, the Defendant was the only other person who could have. The trial court denied the Defendant's motion for a judgment of acquittal without elaboration.

The Defendant called McKaiely Wade to testify on his behalf. Wade testified that Green and Bullard were romantic partners who lived at 402 South Mountain Street in 2021. Wade remembered "stay[ing] the night" with Green and Bullard that April "because her boyfriend . . . kick[ed] [her] out when [she] was pregnant"; however, Wade also testified that her baby was born that February. Wade testified that she only saw the Defendant at the residence "two or three times," and she never saw him stay overnight. Wade said Sullivan and "Ryan", "Destiny", and "Brent" would stay the night at the residence. Wade testified that she was present for the execution of the search warrant and that the residence

did not have electricity at the time. Wade said that the Defendant lived at her father's house from February to August 2021.

On cross-examination, Wade said that she could not recall Ryan, Destiny, and Brent's last names. Wade agreed that she lived at the address on her driver's license, and that if something happened to her while she was away from home with her child, her child would either be taken to that address or to her sister's residence. Wade testified that she "thought it was known" the Defendant did not live at 402 South Mountain Street, and that she was not sure why the Defendant called her to testify. The Defendant presented no further proof.

The jury found the Defendant guilty of possession of over three hundred grams of methamphetamine with intent to sell or deliver, and not guilty of possession of fentanyl with intent to sell or deliver. The jury affixed a fine of $75,000 to the Defendant's conviction. At the sentencing hearing, the trial court found the Defendant was a career offender and imposed a sentence of 60 years' imprisonment.

The Defendant timely filed a motion for new trial on July 19, 2023. At a new trial hearing on February 15, 2024, the trial court denied the Defendant's motion for new trial and incorporated the State's response into its written order denying the motion. The Defendant timely filed a notice of appeal on March 15, 2024, and this case is properly before this court for review.

## ANALYSIS

On appeal, the Defendant contends the trial court erred on three separate grounds: (1) in denying his motions to suppress because the search warrant and affidavit did not establish probable cause and because the affidavit contained false information in violation of Franks v. Delaware, 438 U.S. 154 (1978), (2) in admitting evidence from the Smith County traffic stop in violation of Rule 404(b), and (3) in denying his motion for judgment of acquittal because the evidence was insufficient to support the Defendant's conviction. We will address each issue in turn.

I. Motions to Suppress. The Defendant contends the trial court erred in denying his motions to suppress (1) because the search warrant did not establish probable cause; and (2) because the affidavit contained several misrepresentations of fact. See Franks, 438 at U.S. 157. To determine whether the trial court erred in denying the Defendant's motions to suppress, we must consider the following standards that govern our review of suppression issues:

[Appellate courts should] uphold the trial court's findings of fact, unless the evidence preponderates against them. State v. Bell, 429 S.W.3d 524, 528 (Tenn. 2014) (citing State v. Climer, 400 S.W.3d 537, 556 (Tenn. 2013); State v. Day, 263 S.W.3d 891, 900 (Tenn. 2008)). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing in the trial court "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from [the] evidence." Bell, 429 S.W.3d at 529 (citing State v. Echols, 382 S.W.3d 266, 277 (Tenn. 2012); Day, 263 S.W.3d at 900; Odom, 928 S.W.2d at 23). The application of law to facts is reviewed de novo, and the appellate court is not obliged to afford a presumption of correctness to the lower court's conclusions of law. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001) (citing State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997)).

State v. Tuttle, 515 S.W.3d 282, 299 (Tenn. 2017).

The Defendant argues that the search warrant did not establish probable cause because the affidavit upon which it was based "never specifically states that drugs are located at 402 South Mountain Street[.]" The Defendant also argues the affidavit contained no nexus between the criminal activity, the place to be searched, and the items to be seized. The Defendant further asserts that the warrant lacked probable cause because it was based on information from an unreliable informant of the criminal milieu.

The State argues that a plain reading of the affidavit shows that it says the Defendant lived at 402 South Mountain Street and alleges that methamphetamine could be found there. The State also argues that the warrant establishes a nexus to criminal activity because it states that Arnold observed the Defendant hiding drugs at that address. Lastly, the State argues Arnold was a reliable informant because the affidavit indicates that law enforcement corroborated some of her statements. We agree with the State.

Under both the Fourth Amendment to the United States Constitution and Article I, Section 7 of the Tennessee Constitution, search warrants shall not issue "unless a neutral and detached magistrate determines that probable cause exists for their issuance." Id. (citing Illinois v. Gates, 462 U.S. 213, 240 (1983); State v. Henning, 975 S.W.2d 290, 294 (Tenn. 1998); State v. Jacumin, 778 S.W.2d 430, 431 (Tenn. 1989)). Article I, Section 7 of the Tennessee Constitution has been consistently interpreted as "'identical in intent and purpose'" to the Fourth Amendment. Id. at 307 (quoting Jacumin, 778 S.W.2d at 435); see State v. Willis, 496 S.W.3d 653, 719 (Tenn. 2016); State v. Davis, 484 S.W.3d 138, 143

(Tenn. 2016). The State must establish probable cause to obtain a search warrant under both constitutions.

The Tennessee Supreme Court has recognized the difficulty in articulating what probable cause means. Id. at 299-300. "Probable cause is more than a mere suspicion but less than absolute certainty." State v. Reynolds, 504 S.W.3d 283, 300 (Tenn. 2016) (citations and internal quotation marks omitted). "'[T]he strength of the evidence necessary to establish probable cause . . . is significantly less than [what is] necessary to find a defendant guilty beyond a reasonable doubt.'" Tuttle, 515 S.W.3d at 300 (quoting State v. Bishop, 431 S.W.3d 22, 41 (Tenn. 2014)). In other words, "'only the probability, and not prima facie showing, of criminal activity is the standard of probable cause.'" Gates, 462 U.S. at 235 (quoting Spinelli v. United States, 393 U.S. 410, 419 (1969)). The probable cause standard is "practical, nontechnical," and "focuse[d] upon the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act[.]" Reynolds, 504 S.W.3d at 300 (citations and internal quotation marks omitted). "'Determinations of probable cause are extremely fact-dependent.'" Tuttle, 515 S.W.3d at 300 (quoting Bell, 429 S.W.3d at 534-35).

In Tennessee, "[a] sworn and written affidavit containing allegations from which a magistrate may determine whether probable cause exists is an 'indispensable prerequisite' to the issuance of a search warrant." State v. Saine, 297 S.W.3d 199, 205-06 (Tenn. 2009) (quoting Henning, 975 S.W.2d at 294). "The affidavit must include facts from which the neutral and detached magistrate may determine, upon examining the affidavit in a commonsense and practical manner, whether probable cause exists." Tuttle, 515 S.W.3d at 300 (citing State v. Smotherman, 201 S.W.3d 657, 662 (Tenn. 2006); Henning, 975 S.W.2d at 294) (emphasis added). In determining whether probable cause supports the issuance of a search warrant, this court "'may consider only the affidavit and may not consider other evidence provided to or known by the issuing magistrate or possessed by the affiant.'" Id. at 299 (quoting Henning, 975 S.W.2d at 295). This court gives the affiant's words their natural meaning and interpretation and reads the language in the affidavit "in a commonsense and practical manner[.]" State v. Norris, 47 S.W.3d 457, 468 (Tenn. Crim. App. 2000) (citing State v. Smith, 477 S.W.2d 6, 8 (Tenn. 1972); State v. Melson, 638 S.W.2d 342, 357 (Tenn.1982)). The appropriate standard for this court is "whether the evidence viewed as a whole provided the magistrate with 'a substantial basis for concluding that a search warrant would uncover evidence of wrongdoing.'" Tuttle, 515 S.W.3d at 299 (quoting Jacumin, 778 S.W.2d at 432). See also Gates, 462 U.S. at 236; Spinelli, 393 U.S. at 419.

"To establish probable cause, the affidavit must show a nexus among the criminal activity, the place to be searched, and the items to be seized." Saine, 297 S.W.3d at 206 (citing State v. Reid, 91 S.W.3d 247, 273 (Tenn. 2002); State v. Smith, 868 S.W.2d 561,

572 (Tenn. 1993)).  In determining whether this nexus has been sufficiently established, we consider "whether the criminal activity under investigation was an isolated event or a protracted pattern of conduct . . . the nature of the property sought, the normal inferences as to where a criminal would hide the evidence, and the perpetrator's opportunity to dispose of incriminating evidence."  Id. (citing Reid, 91 S.W.3d at 275; Smith, 868 S.W.2d at 572). "'To ensure that the magistrate exercises independent judgment, the affidavit must contain more than mere conclusory allegations by the affiant.'"  Tuttle, 515 S.W.3d at 299 (quoting Henning, 975 S.W.2d at 294); see Gates, 462 U.S. at 239.  "An affidavit in support of a search warrant must set forth facts from which a reasonable conclusion might be drawn that the evidence is in the place to be searched."  Smith, 868 S.W.2d at 572.  The magistrate's probable cause determination is entitled to great deference by an appellate court.  Tuttle, 515 S.W.3d at 300 (citing Jacumin, 778 S.W.2d at 431-32; Saine, 297 S.W.3d at 207).

Citizen informants have a presumption of reliability if the affidavit identifies the source of the information as a citizen informant.  Id. at 301 (citing State v. Williams, 193 S.W.3d 502, 507 (Tenn. 2006)).  However, "no presumption of reliability applies to information supplied by an unknown informant or an informant from the 'criminal milieu.'"  Id. (citing Smotherman, 201 S.W.3d at 662).  Prior to the Tennessee Supreme Court's decision in Tuttle, an officer relying in part on information from a criminal informant in a search warrant affidavit had to establish that the informant (1) had a basis of knowledge and (2) was credible or their information was reliable.  Id. (citing Williams, 193 S.W.3d at 507).  This two-pronged test, known as the Aguilar/Spinelli test, originated from two United States Supreme Court cases—Aguilar v. Texas, 378 U.S. 108 (1964) and Spinelli v. United States, 393 U.S. 410 (1969).  Id.  In 1983, the United States Supreme Court in Illinois v. Gates abandoned the Aguilar/Spinelli test in favor of a totality-of-the-circumstances analysis.  Id. at 238.

In Gates, the Court held that while "an informant's 'veracity,' 'reliability' and 'basis of knowledge' are all highly relevant in determining the value of [an informant's] report," these elements should not "be understood as entirely separate and independent requirements to be rigidly exacted in every case," but instead "should be understood simply as closely intertwined issues that may usefully illuminate the commonsense, practical question whether there is 'probable cause' to believe that contraband or evidence is located in a particular place."  Id. at 230.  Specifically, the Court explained:

> The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.  And

the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for . . . conclud[ing]" that probable cause existed. We are convinced that this flexible, easily applied standard will better achieve the accommodation of public and private interests that the Fourth Amendment requires than does the approach that has developed from Aguilar and Spinelli.

Id. at 238-39 (emphasis added) (footnote and citations omitted).

The Gates Court recognized, as a part of the totality-of-the-circumstances analysis, "the value of corroboration of details of an informant's tip by independent police work." Id. at 241. It also specifically acknowledged the value of corroboration of innocent details when it reiterated that "'corroboration through other sources of information reduced the chances of a reckless or prevaricating tale,' thus providing 'a substantial basis for crediting the hearsay.'" Id. at 244-45 (quoting Jones v. United States, 362 U.S. 257, 269, 271 (1960)). "Sufficient information must be presented to the magistrate to allow that official to determine probable cause; [the magistrate's] action cannot be a mere ratification of the bare conclusions of others." Id. at 240. The Court explained that judicial review of search warrant affidavits "does not lend itself to a prescribed set of rules, like that which had developed from Spinelli. Instead, [a more] flexible, common-sense standard . . . better serves the purposes of the Fourth Amendment's probable cause requirement." Id. at 239.

In 1989, in State v. Jacumin, 778 S.W.2d at 436, the Tennessee Supreme Court declined to follow the Gates totality-of-the-circumstances analysis and chose to retain the Aguilar/Spinelli test to determine whether there was probable cause to support the issuance of a search warrant under Article I, Section 7 of the Tennessee Constitution. The Jacumin court held that if the Aguilar/Spinelli test was "more in keeping with the specific requirement of Article 1, Section 7 of the Tennessee Constitution that a search warrant not issue 'without evidence of the fact committed,'" so long as the test was "not applied hypertechnically[.]" Id.

In 2014, while Tennessee courts continued to apply the Aguilar/Spinelli test under the binding precedent of Jacumin, the Tennessee Supreme Court decided State v. Bishop, 431 S.W.3d at 22. Although the Bishop court reaffirmed the appropriateness of the Aguilar/Spinelli test for determining probable cause, it emphasized the importance of independent corroboration, even of innocent details, in applying this two-prong test:

The credibility of the informant's information may also be buttressed by independent corroboration of its details. However, it is not necessary to corroborate every detail of the informant's information, Jacumin, 778 S.W.2d at 432, 436, or to "directly link the suspect to the commission of the

- 18 -

crime." Corroboration of "only innocent aspects of the story" may suffice. Melson, 638 S.W.2d at 355 (quoting United States v. Rollins, 522 F.2d 160, 164-65 (2d Cir. 1975)); see also Smotherman, 201 S.W.3d at 664.

Id. at 38.

In 2017, the Tennessee Supreme Court overruled Jacumin in State v. Tuttle and adopted the Gates totality-of-the-circumstances analysis for determining whether an affidavit establishes probable cause for issuance of a warrant. Tuttle, 515 S.W.3d at 289, 305, 307-08. The court asserted that the Gates totality-of-the-circumstances analysis was superior to the Aguilar/Spinelli test:

Time has proven that the totality-of-the-circumstances analysis is not inadequate or too nebulous as a test for determining probable cause. Under Gates, "an informant's 'veracity,' 'reliability,' and 'basis of knowledge'" remain "highly relevant in determining the value of his report," Gates, 462 U.S. at 230. But by ensuring that these factors are not viewed as entirely separate prerequisites to probable cause, requiring rigid, formulistic, and technical analysis, Gates actually improves upon the Aguilar/Spinelli test. Id. at 230-31.

Id. at 306. The court explained that, under the totality of the circumstances analysis:

[T]he informant's basis of knowledge and veracity or credibility remain highly relevant considerations. Rather than separate and independent considerations, they "should [now] be understood simply as closely intertwined issues that may usefully illuminate the commonsense, practical question whether there is 'probable cause' to believe that contraband or evidence is located in a particular place." Gates, 462 U.S. at 230, 103 S. Ct. 2317. Thus, we will apply the Gates test to determine whether the affidavit sufficiently established probable cause for issuance of the warrant.

Id. at 308.

Before applying the totality-of-the-circumstances analysis in this case, we must first review the Defendant's assertion that the affidavit contained false statements in violation of Franks, 438 U.S. at 154. See Tuttle, 515 S.W.3d at 308 (reviewing an affidavit for false statements before applying the totality-of-the-circumstances analysis). In Franks, the Supreme Court held that:

- 19 -

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

Franks, 438 U.S. at 155. Thus, we are required to exclude any knowing, intentional, or reckless misrepresentations from the affidavit before assessing whether it established probable cause. Tuttle, 515 S.W.3d at 308.

"[T]he law is settled that a fraudulent misrepresentation of a material fact will invalidate a search warrant." State v. Little, 560 S.W.2d 403, 406 (Tenn. 1978) (collecting cases). "'[T]here are two circumstances that authorize the impeachment of an affidavit sufficient on its face[:] (1) a false statement made with intent to deceive the Court, whether material or immaterial to the issue of probable cause[;] and (2) a false statement, essential to the establishment of probable cause, recklessly made.'" Tuttle, 515 S.W.3d at 308 (quoting Little, 560 S.W.2d at 407) (alterations in original). To establish recklessness, the Defendant must show "that a statement was false when made and that affiant did not have reasonable grounds for believing it, at that time." Little, 560 S.W.2d at 407. "The defendant bears the burden of proving the allegation of falsity by a preponderance of the evidence." Tuttle, 515 S.W.3d at 308 (citing State v. Yeomans, 10 S.W.3d 293, 297 (Tenn. Crim. App. 1999); Franks, 438 U.S. at 171).

Here, the Defendant argues the affidavit was misleading because it implied that Arnold's written statement said that he lived at 402 South Mountain Street when it does not, and because the text messages referred to in the affidavit do not confirm his alleged trip to Atlanta. The Defendant also argues the affidavit was misleading because it states that the bag hidden behind a picture contained methamphetamine, even though Arnold's written statement did not specify the contents of the bag.

Although Arnold did not provide the Defendant's address in her written statement, the record clearly shows that the affiant's statement, "[The Defendant] resides at 402 S. Mountain St." was not false when it was made. Sergeant Fields testified at trial that the Defendant's driver's license listed 402 South Mountain Street as his address, and both the affiant and Detective Merriman testified that they had prior knowledge that the Defendant

lived there. What remains of the Defendant's argument is an assertion that the affiant negligently implied that he learned the Defendant's address from Arnold's written statement and not another source. However, we will not strike language from an affidavit based on allegations of negligence alone. See Tuttle, 515 S.W.3d at 308 (quoting Yeomans, 10 S.W.3d at 297) ("'Allegations of negligence . . . are insufficient to invalidate the search warrant.'").

The Defendant has failed to show that the statements in the affidavit related to his alleged trip to Atlanta and the text messages confirming the trip were false or made recklessly. Detective Merriman testified at the first suppression hearing that the text messages showed that the Defendant was somewhere south of DeKalb County at a time that lines up with his alleged trip to Atlanta. Detective Merriman also testified that the Defendant texted that he was at a rest stop when asked when he would return home, which indicated to Detective Merriman that the Defendant was traveling at the time. We conclude that the affiant did not recklessly or intentionally mislead the court in stating that the Defendant traveled to Atlanta to purchase narcotics.

The Defendant has also failed to show that the statement that the bag he had hidden behind a picture contained methamphetamine was a false statement, recklessly made. While Arnold's written statement does not specify the contents of the bag, the entire statement is about the Defendant's possession of, and intent to sell, methamphetamine. Taken in context, Arnold clearly alleged that the Defendant hid a bag of methamphetamine behind a picture in his kitchen. This commonsense reading of Arnold's statement is bolstered by Sergeant Field's testimony at the second suppression hearing that Arnold told him the bag contained methamphetamine during her post-arrest interview. It is also bolstered by the fact that law enforcement found a large bag of methamphetamine in the Defendant's kitchen. We conclude that the affiant's statement that the bag contained methamphetamine was not misleading, and that the trial court did not err in denying the Defendant's motions to suppress based on Franks violations.

Under the totality-of-the-circumstances and reviewing the affidavit "in a commonsense and practical manner," we conclude that the information in the affidavit provided the magistrate with a substantial basis for determining that a search of the Defendant's residence, 402 South Mountain Street, would uncover evidence of wrongdoing. See id. at 310. The affidavit details how the investigation in this case began with a traffic stop in Smith County during which Sgt. Fields found 396 grams of methamphetamine in a vehicle the Defendant and Arnold occupied. The affidavit explains that Sgt. Fields arrested the Defendant and Arnold, and that Arnold spoke with Sgt. Fields about "two locations in DeKalb County that had large quantities of methamphetamine[.]" The affiant summarized the information in Arnold's written statement, specifically, that the Defendant was a methamphetamine dealer who had hidden a Ziploc bag of

methamphetamine "behind a picture that sits on top of . . . wooden cabinets." Arnold had firsthand knowledge of the location of the drugs because she witnessed the Defendant hiding them before leaving for Smith County.

The Defendant contends that the search warrant and affidavit contain no nexus among the place to be searched, criminal activity, and the items to be seized because they do not state that methamphetamine can be found at 402 South Mountain Street. However, the affidavit states that "[the Defendant] resides at 402 S Mountain St. Smithville, TN 37166," and, in the following sentence, states that Arnold saw the Defendant hide a bag of methamphetamine "behind a picture . . . on top of . . . wooden cabinets" before the pair "left and went to Smith County." The Defendant asks us to read these sentences in isolation, but it is more practical to read them together, with the first sentence providing context for the second. Reading the affidavit in this way shows that Arnold saw the Defendant hide a bag of methamphetamine behind a picture in his home before they went to Smith County. We conclude that these sentences, along with the statement that the Defendant was found with one pound of methamphetamine in Smith County, are sufficient to establish a nexus between 402 South Mountain Street, criminal activity, and the items to be seized.

Finally, the affidavit shows that law enforcement independently corroborated Arnold's statement. The affidavit states that Arnold alleged the Defendant traveled to Atlanta to purchase narcotics the day before the Smith County traffic stop, and that Sgt. Fields "saw text messages [from Arnold's cellphone] that confirmed that [the Defendant] had made a trip to Atlanta [the previous day]." The affidavit also states that a confidential informant confirmed the information Arnold provided about narcotics in McKeown's home in Dowelltown. See Gates, 462 U.S. at 244-45 (quoting Jones, 362 U.S. at 269, 271) ("It is enough, for purposes of assessing probable cause, that 'corroboration through other sources of information reduced the chances of a reckless or prevaricating tale,' thus providing "a substantial basis for crediting the hearsay."); Bishop, 431 S.W.3d at 38 ("[I]t is not necessary to corroborate every detail of the informant's information . . . or to directly link the suspect to the commission of the crime. Corroboration of only innocent aspects of the story may suffice.") (citations omitted and internal quotation marks omitted).

After considering the totality of the circumstances described in the affidavit, we conclude that the affidavit sufficiently established probable cause for issuance of a search warrant for the Defendant's home at 402 South Mountain Street and that the trial court did not err in denying the Defendant's motions to suppress.

II. Admission of Rule 404(b) Evidence. The Defendant argues the trial court abused its discretion by admitting prior bad act evidence related to the Smith County traffic stop.

In response, the State argues, and we agree, that the trial court properly admitted the evidence.

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). This rule recognizes that such evidence "carries with it the inherent risk of the jury convicting the defendant of a crime based upon his bad character or propensity to commit a crime," rather than convicting him based on the strength of the evidence. State v. Thacker, 164 S.W.3d 208, 239 (Tenn. 2005) (citing State v. Rickman, 876 S.W.2d 824, 828 (Tenn. 1994)). "[T]he risk that a jury will convict for crimes other than those charged–or that, uncertain of guilt, it will convict anyway because a bad person deserves punishment–creates a prejudicial effect that outweighs ordinary relevance." Id. (quoting State v. Sexton, 368 S.W.3d 371, 403 (Tenn. 2012)). This risk is "particularly strong when 'the conduct or acts are similar to the crimes on trial.'" State v. Clark, 452 S.W.3d 268, 289 (Tenn. 2014) (quoting Rickman, 876 S.W.2d at 828). As such, the Tennessee Supreme Court has encouraged trial courts to take a "'restrictive approach' to Rule 404(b) evidence because such proof 'carries a significant potential for unfairly influencing a jury.'" State v. Jackson, 444 S.W.3d 554, 601 (Tenn. 2014) (quoting State v. Dotson, 254 S.W.3d 378, 387 (Tenn. 2008)). However, such evidence may be admissible for "other purposes," such as establishing motive, intent, guilty knowledge, identity of the defendant, absence of mistake or accident, a common scheme or plan, contextual background, opportunity, or preparation. Tenn. R. Evid. 404(b); State v. Berry, 141 S.W.3d 549, 582 (Tenn. 2004).

Before admitting evidence of other crimes, wrongs, or acts, the following requirements must be met:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). When "a trial court substantially complies with the procedures set out in Rule 404(b) for evaluating the admissibility of evidence, the court's decisions will be given great deference on appeal and will be reversed only if the trial court abused its

discretion." State v. Jarman, 604 S.W.3d 24, 49 (Tenn. 2020) (citing State v. Dotson, 450 S.W.3d 1, 76-77 (Tenn. 2014), and State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997)). Without substantial compliance, however, the trial court will be afforded no deference. DuBose, 953 S.W.2d at 652.

Here, the trial court held a hearing outside of the jury's presence and found that the evidence of the traffic stop was relevant to the issue of intent and necessary to complete the story. The trial court also found that the evidence of prior bad acts was clear and convincing, and that its probative value was not outweighed by the danger of unfair prejudice. We conclude that the trial court substantially complied with the procedures in Rule 404(b); accordingly, we review for an abuse of discretion. "Reviewing courts will find an abuse of discretion only when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party." State v. Herron, 461 S.W.3d 890, 904 (Tenn. 2015) (citations omitted) (internal quotation marks omitted).

The Defendant argues that the evidence was unduly prejudicial and had no probative value other than proving that he had a propensity to engage in criminal behavior. The State argues, and we agree, that the evidence from the traffic stop was relevant to the Defendant's intent to possess and sell methamphetamine and was necessary to "complete the story."

At the 404(b) hearing, Sgt. Fields testified that he found 396 grams of methamphetamine and digital scales in a vehicle the Defendant occupied during the Smith County traffic stop. Sergeant Fields also testified that, during his investigation, he learned that the Defendant had more methamphetamine in DeKalb County. In State v. White, we concluded that evidence of a prior drug exchange with an undercover officer was evidence of the Defendant's intent to possess and sell drugs. 2012 WL 4470652, at *8-*9. The Defendant argues that White is inapplicable because the prior bad act evidence in White involved an actual sale and exchange of drugs, unlike the instant case. The Defendant's argument misses the mark. Sergeant Fields testified that the traffic stop was a "buy bust," and that he immediately detained the Defendant when the Defendant pulled up to the post office. Accordingly, the record establishes that Sgt. Fields intervened before any drug transaction could occur. Under these circumstances, we conclude the presence of digital scales and methamphetamine in the vehicle the Defendant was driving is evidence that he possessed the methamphetamine at his residence with the intent to sell or deliver. The trial court did not abuse its discretion in denying the Defendant's motion in limine to exclude evidence from the Smith County traffic stop under Rule 404(b). The Defendant is not entitled to relief.

III.  Sufficiency of the Evidence. The Defendant contends the trial court "erred in denying his Motion for Judgment of Acquittal as the evidence was insufficient to sustain his conviction[.]"  In the argument section of his brief, the Defendant argues that the State failed to prove constructive possession because there was no evidence of when the Defendant was last present at 402 South Mountain Street and other individuals lived there.

The State responds that it proved the Defendant lived at 402 South Mountain Street and established constructive possession because he "attempted to deal drugs, including methamphetamine, just prior to the search of his residence," and had only been in custody a brief time when DCSD executed the search warrant.  The State also argues that the Defendant's prior drug dealings and the quantity of the drugs found at 402 South Mountain Street supported the jury's conclusion that the Defendant intended to sell or deliver the drugs.  We agree with the State.

Motions for judgment of acquittal are governed by Rule 29 of the Tennessee Rules of Criminal Procedure, which provides, in pertinent part:

> **(b) Grounds for Judgment of Acquittal.** On defendant's motion or its own initiative, the court shall order the entry of judgment of acquittal of one or more offenses charged in the indictment, presentment, or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses.

> **(c) Proof After Denial of Motion.** If--at the close of the state's proof--the court denies a defendant's motion for judgment of acquittal, the defendant may offer evidence without having reserved the right to do so.

Tenn. R. Crim. P. 29(b), (c).  When considering a motion for judgment of acquittal, whether at the close of the State's proof or after the conclusion of all proof at trial, the trial court is only concerned with the legal sufficiency of the evidence and not with the weight of the evidence.  State v. Collier, 411 S.W.3d 886, 892 (Tenn. 2013), abrogated on other grounds by State v. Thomas, 687 S.W.3d 223 (Tenn. 2024), (citing State v. Blanton, 926 S.W.2d 953, 957 (Tenn. Crim. App. 1996); State v. Adams, 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995); State v. Hall, 656 S.W.2d 60, 61 (Tenn. Crim. App. 1983)).  "This rule empowers the trial judge to direct a judgment of acquittal when the evidence is insufficient to warrant a conviction either at the time the state rests or at the conclusion of all the evidence."  State v. James, 315 S.W.3d 440, 455 (Tenn. 2010) (citing Overturf v. State, 571 S.W.2d 837, 839 & n.2 (Tenn. 1978)).  If a defendant chooses to present proof after the trial court denies the motion for judgment of acquittal made at the close of the State's case-in-chief, then he "waive[s] any claim of error for failure to grant the motion for judgment of acquittal at the conclusion of the proof offered by the State."  Collier, 411

S.W.3d at 893. However, if the defendant renews his motion for judgment of acquittal at the conclusion of all the evidence, he does not "waive his right to appeal the denial of the motion made at the close of all of the proof or to challenge the sufficiency of the convicting evidence." Id.

In this case, the Defendant chose to offer proof following the trial court's denial of his motion for a judgment of acquittal at the close of the State's proof, and he failed to renew his motion for judgment of acquittal at the close of all the proof. As such, the Defendant has waived his right to appeal the denial of his motion. See State v. Gilley, 297 S.W.3d 739, 763 (Tenn. Crim. App. 2008) (citing Finch v. State, 226 S.W.3d 307, 317 (Tenn. 2007) (declining to revisit the waiver rule promulgated in Mathis v. State, 590 S.W.2d 449, 453 (Tenn. 1979); State v. Johnson, 762 S.W.2d 110, 121 (Tenn. 1988); and State v. Ball, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998)). Accordingly, our review of the sufficiency of the evidence is not based solely on the evidence offered during the State's case-in-chief but must also necessarily include the proof offered by the Defendant.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are

consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

As charged in this case, Tennessee Code Annotated section 39-17-434 provides that "[i]t is an offense for a defendant to knowingly . . . [p]ossess methamphetamine with intent to manufacture, deliver or sell methamphetamine." Tenn. Code Ann. § 39-17-434(a)(4); see also § 39-17-417(a)(4) ("It is an offense for a defendant to knowingly . . . [p]ossess a controlled substance with intent to manufacture, deliver or sell the controlled substance."). A violation that involves "[t]hree hundred (300) grams or more of any substance containing amphetamine or methamphetamine or any salt of an optical isomer of amphetamine or methamphetamine," is a Class A felony. Id. at § 39-17-417(j)(10). "It may be inferred from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing." Id. at § 39-17-419.

Here, the Defendant does not dispute that law enforcement found more than three hundred grams of methamphetamine at 402 South Mountain Street. The only issues are whether the Defendant (1) possessed the methamphetamine and (2) had the intent to sell or deliver the methamphetamine.

A person may possess contraband alone or jointly with others. State v. Copeland, 677 S.W.2d 471, 476 (Tenn. Crim. App. 1984). "Possession may be actual or constructive." State v. Robinson, 400 S.W.3d 529, 534 (Tenn. 2013) (citing State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001)). Constructive possession is established when a person has "'the power and the intention at a given time to exercise dominion and control over an object, either directly or through others.'" State v. Williams, 623 S.W.2d 121, 125 (Tenn. Crim. App. 1981) (quoting United States v. Craig, 522 F.2d 29, 32 (6th Cir. 1975)). It has also been defined as "'the ability to reduce an object to actual possession.'" Id. (quoting United States v. Martinez, 588 F.2d 495, 498 (5th Cir. 1979)). "[C]onstructive possession rests on the totality of the circumstances of each case[.]" State v. Pierce, No. E2023-00163-CCA-R3-CD, 2023 WL 8440352, at *4 (Tenn. Crim. App. Dec. 5, 2023) (citations omitted).

The Defendant argues that the State failed to prove constructive possession, citing State v. Horton, No. W2019-00948-CCA-R3-CD, 2021 WL 2556646, at *8 (Tenn. Crim. App. June 22, 2021) (concluding there was no proof connecting the defendant to drugs found pursuant to a search warrant "other than [his] presence in the home where the contraband was found[.]"). The Defendant argues the evidence in this case is weaker than

in Horton because he was not present when DCSD executed the search warrant. The Defendant also argues that the State failed to show that the drugs did not belong to Sullivan or anyone else who frequented 402 South Mountain Street. The Defendant's reliance on Horton is misplaced, as it is factually distinguishable. The defendant in Horton was found in a residence during the execution of a search warrant and various drugs were found. Other than testimony that the defendant had been observed at the residence during the surveillance period and a few personal items being found at the residence, the State presented no proof that the defendant lived at the residence. In this case, the Defendant's driver's license listed his address, which was the same as the residence searched. Additionally, the Defendant's minor daughter and his mother were at the residence at the time of the search. Accordingly, the analysis in Horton does not apply.

Viewed in the light most favorable to the State, the record amply establishes that the Defendant constructively possessed the methamphetamine at 402 South Mountain Street. Less than twenty-four hours before DCSD executed the search warrant, Sgt. Fields arrested the Defendant after finding 396 grams of methamphetamine and digital scales in the vehicle he was driving. The Defendant's driver's license listed 402 South Mountain Street as his address. Sergeant Fields contacted Phillips, the Defendant's mother, to pick up his minor daughter from the scene of the traffic stop, and both Phillips and the Defendant's daughter were present at 402 South Mountain Street when DCSD executed the search warrant hours later. A reasonable jury could conclude that the Defendant resided at 402 South Mountain Street and was able to reduce the methamphetamine there to his actual possession. Consequently, we conclude that the evidence is sufficient to establish the Defendant's constructive possession of the methamphetamine found at 402 South Mountain Street.

We are not persuaded by the Defendant's argument that he could not have constructively possessed methamphetamine in DeKalb County because he was in custody in Smith County. Nor are we convinced by his assertions that the State failed to prove that he intended to sell or deliver the methamphetamine. The Defendant had been in custody for less than a day when DCSD executed the search warrant. Sergeant Fields arrested the Defendant in Smith County on April 6, 2021, the DeKalb County Criminal Court issued the search warrant at 10:29 p.m. that day, and DCSD executed the warrant less than two hours later. DCSD found over 425 grams of methamphetamine in the Defendant's freezer, and Detective Merriman testified that people rarely possess that much methamphetamine unless they intend to sell it. A reasonable jury could conclude that the Defendant had the power and the intention to directly exercise dominion and control over the methamphetamine in his home from the moment he left the house on April 6th to the moment Sgt. Fields arrested him. The jury was also permitted to infer that the Defendant intended to sell or deliver the methamphetamine based on its weight alone. See Tenn. Code Ann. § 39-17-419. In addition, Sergeant Fields found digital scales and 396 grams of methamphetamine in a vehicle the Defendant was driving and $2,100 in cash on his person

shortly before DCSD searched his home. From this, a reasonable jury could conclude that the Defendant regularly sold methamphetamine and intended to sell the methamphetamine in his freezer. We conclude that the evidence was sufficient to sustain the Defendant's conviction for possession of over three hundred grams of methamphetamine with intent to sell or deliver. Accordingly, the Defendant is not entitled to relief.

## CONCLUSION

Based on the foregoing, the judgment of the trial court is affirmed.


s/                    Camille                    R. McMullen_____
CAMILLE R. MCMULLEN, PRESIDING JUDGE